**WINKELMAN et al. v. GENERAL MOTORS CORPORATION et al.**

**KAHN v. SAME.**

District Court, S. D. New York.

Aug. 14, 1940.

Charles Winkelman, of New York City, (Arthur Berenson, of New York City, of counsel), for plaintiffs.

Unger & Pollack, of New York City, for plaintiff Kahn.

Davis, Polk, Wardwell, Gardiner & Reed, of New York City (Ralph M. Carson and S. Hazard Gillespie, both of New York City, of counsel), for defendants Prosser, Whitney and Morgan.

LEIBELL, District Judge.

Three of the defendants, Seward Prosser, George Whitney and Junius S. Morgan, move on supporting affidavits, pursuant to Rule 56(b), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, for a summary judgment dismissing the complaint as to them. The action is a consolidation of actions brought by minority stockholders against General Motors Corporation, its officers and directors.

The earliest action of the present consolidated actions was instituted in this court October 19, 1936, by Harry Jacobson holding 150 shares. A few days later the plaintiffs, Augusta Winkelman, Daniel Nishman and Charles Schiff, together with the said Harry Jacobson, instituted a similar action in the New York state court. That action was removed to this court and later consolidated with the original Jacobson action. Kahn v. General Motors Corp., D.C., 29 F.Supp. 802. The latest complaint in the consolidated action is a second amended complaint served October 10, 1938. On April 21, 1938, Fannette S. Kahn instituted in the state court an action identical with that of these other plaintiffs. The Kahn suit was removed to this court June 10, 1938, and by stipulation of attorneys, dated November 28, 1939, the second consolidated and amended complaint in the Winkelman-Jacobson action, with slight changes, was adopted as the amended complaint in the Kahn action.

The consolidated amended complaint contains many allegations asserting that all the defendants, beginning in 1918 and continuing to date, have been participants in a fraudulent scheme or conspiracy to loot General Motors Corporation of its assets through the payment of illegal bonuses and extra compensation. To do this, it is alleged, all the defendants coerced the corporation to enter into "illegal, improper and ultra vires transactions, arrangements

See, also, 1 F.R.D. 695.

and agreements" and, in effect, the charge is that the payments made amounted to mere gifts, without legal consideration in services rendered. It is also charged that the bonus plans were illegal because they provided for payment in stock at other than market prices and that the total amount available for bonuses under the terms of the corporate resolution was not correctly calculated. So far as they are relevant to this action, the particular plans under which the bonuses and extra compensation were paid are described below.

### Original Bonus Plan.

1. On August 27, 1918, at a regular stockholders' meeting General Motors Corporation adopted a plan whereby not in excess of 10% of its net income over and above 6% (changed on November 16, 1922 to 7%) of the capital invested (later changed on November 26, 1923, to "capital employed") in its business was to be laid aside for distribution as bonuses to the officers and employees of the company.

### The Managers Securities Company Plan.

2. On November 26, 1923, the stockholders voted to amend the bonus plan by providing that one-half of the 10% fund should be paid to a corporation called Managers Securities Company. Managers Securities Company was a Delaware corporation formed in 1923. Its capital stock consisted of 288,000 shares of 7% cumulative non-voting, convertible preferred stock of a par value of $100; 40,000 shares of Class A stock of a par value of $100; and 40,000 shares of Class B stock of a par value of $25. General Motors purchased the entire issue of Class A and Class B stock for $5,000,000 cash and sold the stock to about 80 of its executives at cost. General Motors Corporation under the plan had the right to fix and control the stock interests of the executives in the Managers Securities Company. As part of the plan General Motors entered into a contract to pay to Managers Securities Company each year from 1923 to 1930, 5% of its net earnings in excess of 7% on the capital employed in its business, and agreed to advance on January 1st of each year, $2,000,000 to the Managers Securities Company on account of any sum due under the agreement or as a loan, or both.

An integral part of the plan was the purchase by Managers Securities Company of a substantial number of shares of General Motors common stock, almost 2,250,000, at $15 a share from a Du Pont subsidiary, the General Company, paying for the same $2.20 per share in cash and $12.80 per share in 7% preferred stock of Managers Securities Company. The General Motors stock was escrowed and released proportionately as the preferred stock of Managers Securities Company was retired with the 5% bonus money reserved annually by Managers Securities Company from General Motors under its said agreement. Blocks of this General Motors common stock, as thus released, were annually allotted as dividends and credited to the accounts of approximately 80 executives of General Motors who were the stockholders of Managers Securities Company. Prior to 1929 Securities Company retired its issue of preferred stock and 30,000 shares of its Class A stock. For the year 1929 Securities Company received from General Motors on account of the bonus plan over $10,000,000. The Managers Securities Company plan was terminated December 31, 1929. When the Managers Securities Company was reorganized in December, 1930, General Motors received 868,557 shares of General Motors common stock for 2,890 shares of Class A and 7,040 shares of Class B stock of Managers Securities Company, which General Motors had acquired under its option to repurchase the stock sold to General Motors executives.

### General Motors Management Plan.

3. As far back as May 1927, in anticipation of the termination of the Managers Securities plan, the General Motors stockholders, on the recommendation of the directors, authorized the expenditures of $35,000,000 before the end of 1930 for the acquisition of General Motors stock to be sold to a new company which would carry on the managers bonus distribution plan, when the Managers Securities plan expired in 1930 by limitation. Accordingly a second managers bonus plan was developed and approved by the Board of Directors of General Motors on February 6, 1930. It was known as the General Motors Management Corporation plan and was adopted at a special stockholders' meeting on March 5, 1930. The essential difference between the General Motors management plan and the former Managers Securities plan is that the General Motors stock which was

to be distributed pursuant to the management plan was purchased directly from General Motors Corporation rather than from a third party.

Under this plan General Motors Management Corporation, a Delaware corporation, was formed. Its capital stock consisted of 50,000 shares of common at $100 par; 500,000 shares of Class A, and 500,000 shares of Class B, each of the par value of $10 a share. General Motors purchased all of the common stock of Management Corporation for $5,000,000 cash. It sold to Management Corporation 1,375,000 shares of General Motors common stock at $40 a share, which was $7.31 a share more than the stock had cost General Motors Corporation. For this stock Management Corporation paid $5,000,000 cash and gave, in addition, $50,000,000 of seven year 6% serial bonds, $7,000,000 of which fell due every year. Under the plan General Motors agreed to pay Management Corporation annually 5% of the General Motors' net earnings above 7% on the capital employed in General Motors business, i. e., one-half of the authorized 10% bonus.

General Motors then sold 38,800 shares of Management Corporation common stock to about 250 of General Motors executives at $100 a share. As in the Securities plan, General Motors retained the right to fix and control at all times the stock ownership in the Management Corporation.

Also as part of the plan, General Motors Corporation agreed to use the other one-half of the authorized bonus of 10%, in purchasing Class A stock of the Management Corporation, the purchase price of which was to be used by Management in acquiring General Motors stock in the market, at a ratio of one share of General Motors stock for each share of Class A stock. In the years 1930 and 1931, General Motors distributed to its employees the Class A stock of Management Corporation (instead of General Motors common stock) thus acquired, as the other one-half of the authorized bonus for those years. There was no bonus for the year 1932. Earnings for the latter half of 1933 made only a reduced bonus possible for that year. On March 28, 1934, the agreement between General Motors Corporation and General Motors Management Corporation was amended so as to relieve General Motors of the obligation to use one-half of the total yearly bonus in the purchase of Class A stock of the Management Corporation.

The obvious purpose of the Management Plan (eliminating the provision for the purchase of Class A stock) was to set aside annually a large block of General Motors stock at a fixed price to be acquired by Management Corporation and credited to the account of the executive stockholders of Management Corporation as a bonus during the years in which the plan was in operation. It was contemplated that the 5% of General Motors net earnings, above 7% on the capital employed, paid to the Management Corporation, together with the dividends on the General Motors common stock owned by the Management Corporation, would be sufficient to pay for the 1,375,000 General Motors common stock within the period of the plan. In the case of the former Securities Company a somewhat similar arrangement had been carried through. At the time the Securities plan ended, the General Motors stock held by the Managers Securities Company was worth many times what Securities Company had paid for it.

The Management Corporation, however, was not so fortunate. By 1934 it had become apparent that not only were the dividends insufficient to keep up the payments on the bonds issued to General Motors Corporation, but there was a constantly mounting interest on arrears. On August 15, 1934, the directors of Motors approved a further revision of the Management Plan, which was adopted by a stockholders' meeting on September 27, 1934. This new adjustment provided, among other things, for a substitution of outright indebtedness of Management Corporation to General Motors for the remainder of the bond issue then outstanding; for a reduction in the interest rate, retroactively on this indebtedness from 6% to 5%; for a surrender of either the entire or part (plus cash) of the unpaid for shares of Motors common stock at $40 per share at the expiration of the plan, in the event that the Management Company had not by that time paid for the stock in full. The Board of Directors and the stockholders had the power to modify the Management plan as above indicated. The adjustments were not inequitable under the circumstances.

This second managers' bonus plan terminated on March 15, 1937. General Motors Corporation, in its report for the year

ending December 31, 1937, summed up the result of the operation of this plan as follows:

"When the Management Corporation was formed in 1930, bonds in the amount of $50,000,000 and cash in the amount of $5,000,000 were received by General Motors Corporation, and a profit of $9,482,-861 was realized on the sale of 1,375,000 shares of General Motors common stock to the Management Corporation. The average rate of interest paid by the Management Corporation on its indebtedness to General Motors Corporation over the seven year period of the plan was approximately 5-1/2%, being 5% for the four year period ended March 15, 1934, and 6% for the three year period ended March 15, 1937. The indebtedness of $50,000,000 was liquidated over the period through cash payments in the amount of $38,276,080 and through the delivery of 293,098 shares of General Motors common stock at $40 a share during 1936 and 1937. These 293,-098 shares of General Motors common stock were included in the treasury stock account at $40 per share, while the market value at the time of receipt averaged approximately $65 per share.

"Thus it might be stated that the objectives of the plan in providing a more important partnership interest through the acquisition of common stock by the executive management were accomplished to the extent of the 1,081,902 shares paid for by the Management Corporation. That all the original 1,375,000 shares of stock were not paid for was due of course to the fact that the period during which the plan was in operation coincided, to an important degree, with the world economic depression."

4. The bonus plans in the main contemplated payment of the bonus in General Motors stock. In 1930 and subsequent years the stock had come either from the treasury or had been acquired in the market. Acquisition of the stock by purchase in the market was expressly authorized. From 1932 to 1936 there was sufficient General Motors stock in the treasury of the corporation for bonus purposes. For the two years prior to 1932 the stock was allocated in bonuses on the basis of cost. From 1932 to 1936, inclusive, the allotments were on the basis of the average daily market price for the year. In the seven bonus years from 1930 to 1937, inclusive, the price at the end of the year was less in four of the years, and higher in three of the years, than the price at which the General Motors stock was alloted in bonus payments. An examination of the schedules set forth in Mr. Sloan's memorandum of March 22, 1938, on the 1937 Bonus Distribution, shows that by not adopting the end of the year price in making the stock allotments for the seven years of 1930 to 1937 (no bonus was declared in 1932) and by employing the cost or average daily market price figure, the corporation got the better price over the entire period. Further, by using the cost price instead of the average daily market price for the years 1930 and 1931, and by reversing that practice for the years 1933 to 1936, the corporation in every year used the more advantageous price. .

The three moving defendants never received any bonuses or extra compensation under any of the plans which the plaintiffs attack in this lawsuit. They were, however, at various times directors and members of the Finance Committee, or of the Salary and Bonus Committee, which passed upon the recommendation of the President or Chairman with respect to the additional compensation to be paid the executives under the bonus plans.

5. The motion for summary judgment is founded upon two main grounds: First, that a judgment rendered in the Supreme Court, New York County, on February 2, 1939, in an action entitled Weiss v. General Motors et al., dismissing a similar action, is res judicata here; second, that on the facts shown by the corporate records submitted there is no triable issue of a material fact, and that on the facts thus shown the plaintiffs have no case. In the event that both of said grounds are not sustained, defendants seek partial summary judgment in respect to transactions barred by the six-year statute of limitations.

6. As to the defense of res judicata, it appears that no opposition was made to a motion for summary judgment in the Weiss action in the state court. The attorney for the plaintiff in the Weiss action admitted in open court that he could not answer the material presented by the moving defendants on that motion. This material comprised some 195 pages, largely composed of certified copies of the minutes of stockholders' and directors' meetings with respect to the adoption and operation of the various bonus plans, together with copies of resolutions of the finance committee with respect to bonus recommenda-

tions. They cover the period from the adoption of the bonus system in 1918 down to 1937. These same exhibits are annexed to the present motion papers.

An examination of the Weiss complaint shows that it deals in a substantially similar way with the matters covered by the consolidated amended complaint, to which the present motion is directed. The individual defendants named are the same, although in the state court suit only the moving defendants were served. General Motors was served and appeared in the Weiss suit by its regular attorney, who was also one of the individual defendant directors. A short form order, granting the motion, "no opposition", was signed January 27, 1939, the day the motion was submitted. It provided that a more complete order be settled. A further order was entered on the motion on January 31, 1939. It states:

" * * * on reading and filing the summons, the complaint verified September 23, 1938, the said defendants' answer verified December 9, 1938, the affidavit of George Whitney sworn to December 31, 1938, the affidavit of J. Robert Winner sworn to December 30, 1938, and the annexed documentary evidence and official records certified by the said J. Robert Winner and numbered pages 1 to 195 consecutively, and after hearing Davis Polk Wardwell Gardiner & Reed (Ralph M. Carson and S. Hazard Gillespie of counsel), attorneys for said defendants, in support of the motion, and Charles Rosenthal (A. L. Pomerantz of counsel) attorney for the plaintiff in opposition thereto, and the said A. L. Pomerantz on behalf of the plaintiff having stated in open court that he had read the said motion papers and that the plaintiff could not answer the same,

 \* \* \* \* \* \*

"Ordered that this action be and the same hereby is dismissed on the merits as to the defendants Junius S. Morgan, Seward Prosser and George Whitney, and that the Clerk of this Court be and he hereby is directed to enter judgment accordingly."

Although there is no fraud or collusion indicated on the part of these defendants or their attorneys in procuring the summary judgment in the Weiss case, there are certain circumstances which I think should make this court hesitate to accept the Weiss judgment as res adjudicata, without further inquiry. Weiss had moved to intervene in the Jacobson suit in this court and the plaintiff's attorneys opposed his intervention and his motion was denied. Weiss thereafter, October 10, 1938, started his own suit in the state court. The only individual defendants served therein were these three defendants. They did not attempt to remove the Weiss suit to this court, as they had the Winkelman and Kahn suits. The attorneys for the plaintiffs in this litigation were not notified of the motion for summary judgment in the Weiss suit until time to appeal from the judgment therein had expired. The General Motors Corporation appeared in the Weiss action by its attorney who was one of the director defendants. The suit was discontinued as against it on February 23, 1939.

There is nothing to show that the state court in the Weiss case was informed of the pendency of these actions in this court, or of any intention on the part of these three defendants to claim that the default or consent judgment in the Weiss suit would be urged as res adjudicata in the pending actions in this court. Under Rule 23, Federal Rules of Civil Procedure, a representative action by a stockholder, to enforce a primary right of the corporation, may not be dismissed in a United States District Court without the approval of the court, and notice of the proposed dismissal must be given to all the stockholders. That is an expression of the public policy which should surround the abandonment, dismissal or settlement of a stockholder's derivative suit. I am of the opinion that this court should not permit itself to be deprived of the right to pass upon the merits of these cases, because of what was in effect a consent judgment in a stockholder's action subsequently brought in another court, entered without notice to any of the security holders under the circumstances above indicated. The Weiss judgment may not have resulted from fraud or bad faith on the part of anybody, but on the circumstances present I feel that it does involve a triable issue of fact and that it would be improper to permit it to form the basis for a summary judgment herein, on the theory that it is res adjudicata of the pending actions in this court, without further inquiry. All issues as to the validity and bona fides of that judgment should be left for the trial of this action. Therefore it is unnecessary to discuss what would be the legal effect of the Weiss judgment on these consolidated actions, assuming its validity and bona fides.

832

■ 7. With respect to the bonus plan adopted in 1918, the Securities plan existing during the years 1923 to 1929, inclusive, and the Management plan existing from 1930 to 1937, inclusive, together with the amendment of the Management plan in 1934, the facts asserted by the moving defendants for the purpose of showing their validity and immunity from attack are of the following character: All the plans were duly adopted at stockholders' meetings. Considering the three plans in order, it would indeed be difficult to uphold a charge of "coercion" against these defendants. The first bonus plan was unanimously approved by the stockholders who attended the meeting on August 27th, 1918. Scarcely less convincing is the record of affirmative votes cast in favor of both the Managers Securities plan and the General Motors Management plan. The former was adopted with only 2,944 dissenting votes out of the 15,373,042 cast, and the latter with only 19 dissenting votes out of the 26,904,439 cast. The plans themselves were mailed to the stockholders before the meeting and ample opportunity was given for the stockholders to protest. All bonuses paid under the plan, to directors who were executives, either in cash or in stock, were first passed upon by a committee of the directors (of which the moving defendants at times were members) who did not themselves in that year receive any bonuses. This was in accordance with the provisions of the plan. No facts have been shown by plaintiffs on this motion, which would support the charge that the bonus plans were part of a fraudulent conspiracy or scheme of any kind.

The bonus declared in the spring of each year was based on the net earnings for the preceding calendar year. It was payable in four installments; one immediately and the others in each of the three following years. If the employment of an executive, to whom a bonus award was made, terminated before he had received the full amount of his bonus award, the unpaid balance of the award was duly apportioned and the General Motors Corporation reacquired his stock interest in the managers corporation. In this way the prospect of possessing the unpaid balance of his bonus was an inducement for his continued service with General Motors. An examination of the corporate records shows that two directors, who started with the General Motors Corporation, later established rival companies, one of which is still flourishing.

Plaintiffs make the criticism that the original bonus plan of 1918, as adopted by the stockholders August 27, 1918, provided that the 10% of the yearly net earnings for bonus purposes was to be calculated "after deducting 6% on the capital invested in each year". However, the bonus plan as put into effect that year provided that "The corporation will establish a bonus fund to which shall be credited yearly an amount equal to 10% of the net earnings of the corporation after deducting 6% on the capital employed in the business of the corporation". What the actual difference may have been, from an accounting viewpoint, between "6% on the capital invested in each year" and "6% on the capital employed in the business of the corporation" does not appear in the voluminous papers submitted. However, the meaning of the net capital employed in the business of the corporation was explained in a letter of the Chairman of the Board of Directors to the stockholders, dated April 11, 1927. It really is immaterial to the issues in this action because in all the modifications of the bonus plans, in 1923, 1930, 1934 and 1937, the expression used is "capital employed" not "capital invested". All resolutions of both stockholders and directors' meetings, except the 1918 meeting, use the words "capital employed", and from their inception all bonuses paid under any plan have been calculated after the deduction of 6%, for a few of the earlier years, and in subsequent years 7%, on "capital employed in the business of the corporation".

The percentage of net earnings to be used for bonus purposes was fixed by the stockholders. As a total bonus to be distributed among the many exceptional employees, managers and high executives in so large and prosperous an organization as the General Motors Corporation, it cannot · reasonably be stamped as excessive. The number of the executives participating in the one-half of the annual bonus under the Management Securities Company plan was as high as 80 and it reached 250 under the General Motors Management Corporation plan. The participants in the total 10% bonus through the years has varied; from 1930 to 1935 it ranged from 1,282 to 2,374; from 1936 it was 9,534; in 1937 it went over 10,000.

The bonus plan provided that the decision of the Finance Committee (of which

these moving defendants were members) as to the amount of corporate earnings to be credited to the bonus fund and the amount of stock and the price thereof deliverable thereunder shall be final, conclusive and binding upon all the parties. Plaintiffs assert that in calculating the 10% for the bonus, the "capital employed in the business of the corporation" was not properly determined. That is an accountant's work. A well-known firm of outside accountants made these calculations. These non-participating directors who served on the Finance Committee were justified in relying on the figures presented by the accounting firm, and they cannot be charged with either negligence or waste if the accountants' calculations were incorrect, either because the accountants did not adopt the proper accounting method or practice, or otherwise erred in arriving at the total of capital employed in the business. These three defendants did not profit from any errors, assuming the accountants did err. The method of determining the price at which the General Motors stock deliverable under the Management Corporation plan was delivered, seems to me to have been reasonable and proper, and on the average, over the period from 1930 to 1936, it worked to the advantage of General Motors Corporation.

There is nothing in either of the managers' bonus plans, in and of itself, that would require the intervention of a court of equity. The main cause of complaint, for which there is some basis, is that the bonuses allotted to certain of the executives, who were also members of the Board of Directors, when added to their salaries as such executives, resulted in excessive compensation in certain years. The record contains nothing specific as to the extent and nature of their services, but it may be assumed that the duties incident to the important offices they held were such as required all the time of men of great ability.

The directors undoubtedly possessed a certain discretion in apportioning the bonus among the executives. The establishment of the various bonus plans with the approval of the stockholders, assumed that the officers and directors charged with the duty of administering the plans would exercise a proper discretion. The Management Securities Company plan and the General Motors Management Corporation plan were not inflexible, except as to the total (5%) of the net earnings (after deducting 7% on the capital employed in the business) which was to be paid to the bonus corporations. The allotment within the bonus corporation, to its shareholder executives, could be controlled by the President or Chairman and the directors. The Finance Committee of the Board of Directors, of which the three moving defendants were at times members, considered and reported on such bonus allotments as were recommended for executives who were also members of the Board of Directors. That was required under the provisions of the plan. The allotment of the other one-half of the total bonus (the 5% that did not go to the executives as stockholders of the bonus corporations) was certainly as flexible as the method followed in allotting the entire 10% since March, 1937, when the General Motors Management Corporation plan expired by limitation. Indeed, some of the executives were given a share in both the 5 percents. The defense that the three moving directors were merely carrying out the wishes of the stockholders in the amounts they reported as bonus awards is not sustained by the provisions of the plans or by the official records as to the manner in which the bonus was administered.

The three moving defendants stress the fact that they did not themselves receive any part of the bonus in any year. There is no presumption of actual or constructive fraud that arises solely from the amount of compensation paid to an officer of a corporation. However, the compensation may be so large under the circumstances involved in a particular case as to constitute spoliation or waste of corporate property, in which instance an investigation in equity is warranted. Rogers v. Hill, 289 U.S. 582, 591, 53 S.Ct. 731, 77 L.Ed. 1385, 88 A.L.R. 744. However, if the bonus these directors approved for any executive was so large as to constitute a waste of the corporate assets it seems to me that they are civilly liable, in a representative action by a stockholder, to the extent that the bonus was a waste—in fact a gift of corporate assets. As Judge Swan wrote in the Rogers v. Hill case, when it was before the Circuit Court of Appeals for this Second Circuit (60 F.2d 109, 113): "If a bonus payment has no relation to the value of services for which it is given,

834

it is in reality a gift in part, and the majority stockholders have no power to give away corporate property against the protest of the minority". The same would seem to apply to directors, a fortiori.

 I have not overlooked the rule that the exercise of business judgment by directors will not be disturbed by the courts in matters of internal management "except where the directors are guilty of misconduct equivalent to a breach of trust, or where they stand in a dual relation which prevents an unprejudiced exercise of judgment". United Copper Secur. Co. v. Amalgamated Copper, 244 U.S. 261, 264, 37 S. Ct. 509, 510, 61 L.Ed. 1119. But if after an examination of all the facts at a trial it is shown "that there were breaches of duty and the compensation voted in such breaches bore no relation to the services rendered," the directors responsible for voting the compensation may be held personally liable. Gallin v. ·National City Bank of New York, 152 Misc. 679, 273 N.Y.S. 87, 118.

Executives who carry the responsibility of directing great business enterprises should be liberally compensated for loyal, constructive work. The results they obtain mean employment for hundreds of thousands of mechanics and laborers at good wages, and profits for the stockholders. General Motors is one of the largest industrial corporations in the world. It made gross yearly sales from 1926 to 1929 of a billion to a billion and a half dollars; from 1935 to 1937 the gross sales were also within that annual range. Its earned annual profits available for dividends for those years varied between $170,000,000 and $275,000,000. A vast army of skilled mechanics are employed by the corporation and its subsidiaries in manufacturing some of the best known automobiles. In 1937 it employed 261,977 persons at a total payroll of $460,451,744. The corporation has established an Employees Savings and Investment Plan, a Group Insurance Plan, Medical and Health Services, and other co-operative organizations for the benefit of its employees.

The General Motors Corporation through its 1918 bonus plan and the 1923 Managers Securities plan established a bonus system which produced princely incomes for its principal executives. The letter of the President of the corporation to the stockholders, dated October 27, 1923, which accompanied the Managers Securities plan, stated: "The enclosed plan involving the formation of the Managers Security Company is designed to interest the men occupying important positions as partners with the stockholders in this corporation." Some 2,250,000 shares of General Motors stock went to about 100 executives in the course of seven years under the 1923 Managers Securities plan alone. The stock was acquired from a Dupont subsidiary at $15 a share and was paid for through the Management Securities Corporation by the allotment to it of one-half the total annual General Motors bonus. A pencil and paper plus market quotations, with some multiplication and figuring, will show how this General Motors stock increased in value during the period the plan was in operation. I mention this, because it serves as a background in which to view the bonuses paid to many of these same executives for the period of 1930 to 1937.

Although I believe in liberal compensation for the heads of large industries, I have just as firm an opinion that in bonuses and extra compensation a limit can be reached and the courts must stand ready to inquire, in the interest of the corporation, if its own executives cannot see when their bonuses have passed beyond reasonable limits. Stockholders, even when notified in advance, cannot very well oppose the introduction of a bonus plan. To afford the managerial heads a share of the profits is both fair and a good business policy. The administration of the bonus plan must be left, as a rule, to these same executives. When, as in this case, the executives own or control a large percentage of the outstanding stock and also sit on the Board of Directors, their voice as to the allotment of the bonus is very influential. Even the appointment by the President or Chairman of a non-participating committee of directors to determine the bonus share of their fellow directors, who are also executives, does not completely remove that influence. The duty of the director executives participating in the bonus seems plain—they should be the first to consider unselfishly whether under all the circumstances their bonus allotments are fair and reasonable.

When salaries of $100,000 a year are supplemented by bonuses of $150,000 to $400,000 a year, as was the case with some of the executives named as defendants in this action, there is presented a problem

that may require a court of equity to inquire into all the relevant facts on the complaint of a stockholder. And this is especially true where those same executives over a period of years have been receiving salaries and bonuses in even larger amounts. Further, although the General Motors stockholders were informed from time to time as to the total amounts awarded annually in bonuses, it was not until recent years that they were given some indication of the percentages of the bonus alloted to the principal executives.

 Any consideration of the salaries paid and bonuses awarded to any executive for the year 1929 is barred by the statute of limitations, at least so far as the liability of these three defendants is concerned. Cwerdinski v. Bent, 256 App. Div. 612, 11 N.Y.S.2d 208, affirmed 281 N. Y. 782, 24 N.E.2d 475. The amounts paid to the executives in salaries plus bonuses for the years 1931, 1933, 1934, and 1938 are not so large as to warrant the conclusion that any part of them constituted a waste of corporate property. No bonuses were declared for the year 1932. But the bonuses paid to some of the executives based on the earnings for the years 1930, 1935, 1936 and 1937 were, in my opinion, so large, when added to their salaries, that they require an investigation in equity in the interest of the General Motors Corporation, so that it may be determined "whether and to what extent payments to the individual defendants" under the bonus plans in effect during those years "constitute misuse and waste of the money of the corporation". Rogers v. Hill, 289 U.S. 582, 592, 53 S.Ct. 731, 735, 77 L.Ed. 1385, 88 A.L.R. 744. All the relevant facts in respect to the bonuses of those four years may be developed at the trial and the judge there presiding will reach his own conclusions on the evidence then before him, as to whether or not the salaries and bonuses paid to the executives for those years constitute a waste of corporate assets. The present decision in no way prejudges the case that may be developed at the trial.

The motion of these three defendants for summary judgment therefore should be granted in part and denied in part. It is granted on the merits in respect to the bonuses paid based on the earnings for the years 1931, 1933, 1934 and 1938; it is denied, as to the bonuses for the years 1930, 1935, 1936 and 1937. The motion is granted in respect to the bonuses for the year 1929 because plaintiffs' claim, as to that year, is barred by the statute of limitations. Cwerdinski v. Bent, supra.

In examining the documents submitted on this motion, I note that at some of the meetings not all three moving defendants were present, and that they did not all serve on the Finance or Bonus Committees that passed upon the bonuses recommended by the President or Chairman of the Board. Just what was the extent of their activities in any one year in respect to the award or approval of the bonuses can be determined at the trial.

Before any proposed order is submitted on this decision, I wish to suggest the following: Some of the bonuses paid to certain of the executives, for the specified years 1930, 1935, 1936 and 1937, may appear to plaintiffs' attorneys to be reasonable and proper, and will not be challenged. In order to further simplify the issues, and in accordance with Rule 56(d), F.R.C.P., I suggest that prior to the settlement of the order on this motion the attorneys for the plaintiffs specify, if possible, the names of the executives or employees whose bonuses, for the years 1930, 1935, 1936 and 1937, they intend to attack as excessive at the trial of this action. It may be that the attorneys for both sides by conferring in advance of the submission of the proposed order will thus greatly reduce the items at issue. If counsel wish to be heard in advance as to the form and scope of the proposed order they may so request, specifying the provisions of the proposed order to which their request is directed.

Submit a proposed order, on two days' notice, in accordance with this opinion.