## WINKELMAN et al. v. GENERAL MOTORS CORPORATION et al.

District Court, S. D. New York.

Dec. 10, 1942.

See, also, D.C., 39 F.Supp. 826; D.C., 44 F.Supp. 960.

For attorneys, see 48 F.Supp. 485, and 492.

LEIBELL, District Judge.

This stockholders' derivative action has been settled on terms discussed in the Court's memorandum dated November 18th, 1942, 48 F.Supp. 500. There is no need of repeating them in detail. As part of the settlement, General Motors Corporation receives $4,500,000 in cash and certain claims are reserved for further litigation, if either the Corporation or a stockholder wishes to sue thereon. In making that reservation the Court does not express any opinion on the merits of the claims or the effect of the

Statute of Limitations on their enforcement. An order approving the compromise or settlement was signed and entered November 20th. The Court has been informed by affidavits that checks for the full amount of the settlement have been received and deposited by the Corporation and that releases have been delivered. The next step will be the entry of an appropriate judgment in accordance with the terms of the compromise, as defined in the Court's memorandum of November 18th. In that judgment provision will be made for allowances to attorneys and accountants whose services in various ways contributed to the settlement of the action and to the recovery of the $4,500,000 cash, or to some part thereof.

Judge Woolsey of this Court has written on the question of allowances to attorneys in two cases that discuss the main points to be considered by the Court in fixing a fair fee for legal services. In re Osofsky, D.C., 50 F.2d 925, was a bankruptcy case in which the litigation instituted by a trustee and his attorneys created practically the entire estate made available to creditors for dividends. In Murphy v. North American Light & Power Co., D.C., 33 F.Supp. 567, the attorneys in a stockholders' derivative suit recovered a substantial sum for the corporation and produced other beneficial results for its stockholders. I had occasion to review the fairness of a fee paid to Mr. Rogers, an attorney, in the stockholders' suit of Rogers v. Hill, D.C., 34 F. Supp. 358, 363, from which I quote as follows:

"The elements to be considered in determining an attorney's fee are stated by Judge Woolsey in Re Osofsky, D.C., 50 F. 2d 925, 927, based on a summary of testimony given by William G. Choate and David B. Ogden on a reference many years ago—'They laid down the following elements as being matters properly to be considered when the fees of an attorney have not been agreed on beforehand, but are to be fixed: (1) The time which has fairly and properly to be used in dealing with the case; because this represents the amount of work necessary. (2) The quality of skill which the situation facing the attorney demanded. (3) The skill employed in meeting that situation. (4) The amount involved; because that determines the risk of the client and the commensurate responsibility of the lawyer. (5) The result of the case, because that determines the real benefit to the client. (6) The eminence of the lawyer at the bar, or in the specialty in which he may be practicing.'"

In the North American Light & Power Co. case (a stockholder's suit) Judge Woolsey significantly remarked (page 570 of 33 F.Supp.) that "VIII. It is appropriate to give allowances in causes like these which involve corporate therapeutics. Trustees v. Greenough, 105 U.S. 527, 26 L.Ed. 1157; Sprague v. Ticonic National Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184."

The applicants for allowances herein have referred me to a list of stockholders' derivative suits in which the amounts allowed for attorney's fees have ranged between 20% and 33⅓% of the recovery. The recovery here is large ($4,-500,000). In cases of this kind the overall percentage should be reduced as the recovery increases, otherwise the amount allowed in dollars would be excessive. In Rogers v. Hill, 289 U.S. 582, at page 592, 53 S.Ct. 731, at page 735, 77 L.Ed. 1385, 88 A.L.R. 744, the high court remarked that a bonus percentage reasonable when adopted, may with the passing years become so large in the amount of dollars paid, due to the growth in profits, that the Court would be charged with a duty to make inquiry to determine if there had been a "misuse and waste of the money of the corporation". In stockholders' suits which attack bonus payments to corporate executives, the payment of very large percentages as fees to attorneys and accountants seems inconsistent, and has resulted in dollar allowances that in some cases have been the subject of considerable comment, if not more. Hornstein, "The Counsel Fee in Stockholder's Derivative Suits", 39 Col.Law Rev. 784, and "Problems of Procedure in Stockholder's Derivative Suits", 42 Col.Law Rev. 574, at p. 587. Precedents as to percentages allowed are of slight value because the amount recovered varied in the cases cited, as did the effort required to make the recovery. It is, of course, advisable to reward fairly attorneys who carry stockholders' suits to a successful judicial determination. Fair and reasonable fees for results actually achieved, with due consideration for the time and effort required, will neither encourage strike suits nor discourage real ones. The preparation and trial of these cases is no easy task and the overhead expense and out of pocket disbursements must be proportionately large.

The adjudication of proper allowances for those who are entitled to share involves

a review of the work of each applicant and a consideration of the extent to which his efforts contributed to the results. My work is made easier by the knowledge I acquired of the relative merit, skill, industry and effectiveness of the attorneys representing stockholders, on a preliminary motion for summary judgment (D.C., 39 F.Supp. 826), in the course of a long trial (44 F.Supp. 960), and in all that followed the trial, which led up to a substantial offer of settlement and its approval in a modified form.

After the usual preliminary motions in these cases, directed to the pleadings, intervention, and the consolidation of actions, the claims asserted against the defendant directors and others were set forth in a rather voluminous second amended complaint in the consolidated Winkelman suit. Then followed the motion for partial summary judgment. Subsequently a number of witnesses were examined before trial. Finally, the case came on for trial on May 7, 1941, and continued for a period of about ten weeks, with some interruptions. The manifold issues presented by the claims asserted and the defenses thereto, the great sums involved, the extensive period covered by the inquiry are readily apparent from a reading of the Court's opinion filed April 10, 1942. Winkelman v. General Motors Corporation, D.C., 44 F.Supp. 960. I shall now consider separately the application for allowances filed herein by attorneys and accountants.

■ Mr. Arthur S. Friend has applied for an allowance. He was actively connected with this case between June 1, 1936, and May 1, 1937, and he continued as attorney of record for Augusta Winkelman until May 2, 1941, when Messrs. Unger & Pollack were substituted. Mr. Friend was brought into the case by Mr. Arthur Berenson in June, 1936, because of his experience and training in important corporate matters. He rendered services in the preparation of the complaints in the Jacobson action in this Court and in the Winkelman-Nishman-Schiff-Jacobson action in the State Court. He was the attorney of record in the Jacobson suit and, together with Charles Winkelman, he was one of the attorneys of record in the other suit. Mr. Arthur Berenson, in opposing any substantial allowance to Mr. Friend, states that Mr. Friend was retained in order to have a local attorney admitted to practice in the New York State and Federal Courts, upon whom papers could be served. That could not have been the real purpose of the retainer. Mr. Winkelman could have attended to those formalities. Further, Mr. Berenson's letter of August 8, 1936, to a Chicago attorney puts Mr. Friend's position in the prospective litigation on a much higher plane.

Mr. Friend has had a wide experience in corporate law, some of it in litigations of this type. He made the preliminary study and analysis of the General Motors bonus plans and of the public corporate records relating thereto. For substantially two months prior to the completion of the final draft of the complaint he devoted practically all his time to the work, conferring with Mr. Arthur Berenson and with associates in his own office. Thereafter he was consulted on the advisability of seeking a remand of the Winkelman suit to the State Court, after it had been removed to the Federal Court. However, in this phase of the litigation other counsel assumed the burden of making the motion, which was denied in April 1937.

After the trial and the Court's decision filed April 10, 1942, Mr. Berenson was unable to come to any agreement with Mr. Friend relative to his fee, so it was understood that Mr. Friend should file his own petition for an allowance. Whatever sum is allowed to him will be considered by the Court in fixing the allowance for Arthur Berenson and his brother Lawrence. In my opinion Mr. Arthur S. Friend is entitled to an allowance of fifteen thousand ($15,000) dollars.

■ Mr. Charles Winkelman, attorney of record for the plaintiff stockholders Augusta Winkelman, Daniel Nishman and Charles Schiff, became interested in this litigation prior to October, 1936. He had been in consultation with a Chicago law firm who represented a stockholder, Harry Jacobson, and with Arthur Berenson, a Boston attorney who claimed to have made a study of the General Motors bonus plans and their operation. Then followed the Jacobson suit in this court, October 19, 1936, and a similar suit, in which Jacobson, Winkelman, Nishman and Schiff were plaintiffs, in the New York State Supreme Court. The latter suit was removed to this Court and consolidated with the Jacobson suit. In April, 1938, Fannette S. Kahn brought a third stockholder's suit in the State Court and on its removal to this Court, all three suits were consolidated. Later Jacobson and Kahn sold their stock.

508

Schiff was substituted as plaintiff in the Jacobson suit. The Kahn suit was dismissed, at the beginning of the trial, because she was no longer a stockholder.

Mr. Winkelman assisted Mr. Berenson and other counsel in the various motions that were made before the consolidated actions came on for trial. He studied the annual reports of General Motors, the notices to stockholders, the reports compiled by Standard Statistics Co. and the reports on Stock Exchange listings. In particular Mr. Winkelman did a great deal of work in assisting Mr. Arthur Berenson in opposing the motion of three of the defendants for partial summary judgment. During the trial of the action he was present daily and cooperated with Mr. Pollack, who had formerly represented Fannette Kahn but was substituted as the attorney for Augusta Winkelman. Mr. Winkelman, after the trial, assisted in the preparation of briefs and proposed findings of fact submitted to the Court.

Most of Mr. Winkelman's work was that of an assistant to others, first to Mr. Arthur Berenson, up to the trial of the action, and during the trial and thereafter as an assistant to Mr. Pollack. I believe that an allowance of seventy-five thousand ($75,000) dollars would adequately compensate Mr. Charles Winkelman for his services and expenses in the six and a half years he has been connected with this litigation.

■ Mr. Arthur Berenson and his brother Lawrence have jointly made applications for allowances. For several months prior to the filing of these actions Mr. Arthur Berenson was of counsel to Mr. Winkelman and together with Mr. Friend helped prepare the original complaints. From that time down to the beginning of 1940 Mr. Arthur Berenson was actively connected with this litigation in the numerous motions that were made by plaintiffs and defendants prior to the trial. Mr. Berenson argued all but a few of these motions. One of them, a motion for partial summary judgment by three of the defendants, was heard by me in the motion part. For several months after that Mr. Arthur Berenson continued filing further answering or replying affidavits and briefs until I finally had to call a halt. I cannot say that I was very favorably impressed by the manner in which he conducted plaintiff's opposition to that motion.

When the consolidated action came on for trial it soon became apparent that Mr. Arthur Berenson was unable to take the lead in presenting the plaintiff's case. He claimed that he had been ill. In about ten days his brother Lawrence Berenson, took his place at the counsel table as the active member of the family. But the real burden of the trial was assumed from the start by Milton Pollack (formerly the attorney for plaintiff Kahn) who became the attorney for plaintiff Winkelman, and the leading trial counsel for the plaintiffs' side.

Mr. Lawrence Berenson played a more active and intelligent part than his brother Arthur, as the trial got under way. He attended regularly, prepared more carefully and submitted more helpful briefs. At the end of the trial Lawrence Berenson filed proposed findings of fact and briefed the main issues in the case. The Berensons had directed their principal attack on the legality of the bonus plans and the amendments thereto, the forfeited stock issue and certain other accounting issues. They were successful on the forfeited stock issue but not on the others, although Mr. Lawrence Berenson did conduct some cross-examination on Exhibit 56, relating to the sale of 1,375,000 shares of General Motors common stock of General Motors Management Corporation in March of 1930.

Of course, if the Jacobson-Winkelman actions had not been instituted under the supervision of the Berensons in October, 1936, many of the important issues on which a recovery was had at the trial would have been barred by the statute of limitations, when the Kahn action was started in June of 1938. And the Kahn litigant sold her stock in August, 1940, so Mr. Pollack had to take over a new client in order to stay in the case. For getting the litigation under way and surviving the numerous preliminary motions Arthur Berenson is entitled to some credit and a fair allowance. For services during the trial and thereafter Lawrence Berenson has also earned the right to an allowance. The amount to be allowed will be to Arthur Berenson and Lawrence Berenson jointly.

In discussing the allowance to Mr. Arthur S. Friend, I indicated that he was brought into the case through Arthur Berenson, and that in fixing an allowance for the Berensons I would keep in mind the fact that an allowance of $15,000 is being made to Mr. Friend. In my opinion an allowance of one hundred and sixty thousand

($160,000) dollars to Arthur Berenson and Lawrence Berenson, jointly, is fair and adequate, and will cover their services and expenses herein.

■ The attorney who deserves the most credit for the trial of this case and the substantial recovery obtained is Mr. Milton Pollack, trial counsel for plaintiff Winkelman. It was soon apparent to me in the first ten days of the trial that Mr. Arthur Berenson, trial counsel for other plaintiff stockholders, was not able to meet the great trial burden he had assumed. This was due in part to poor health and also to what appeared to me to be a lack of preparation for trial and a failure to recognize the real and most fruitful issues in this litigation. Later his brother, Mr. Lawrence Berenson, took over and was of more help to the Court both in argument and briefs. But it was Mr. Pollack who really did the trial work for the plaintiffs. He developed the evidence on the main items on which plaintiff recovered. His preparation for trial, his cross-examination of witnesses, his analysis of voluminous corporate records and schedules, his short and enlightening memoranda as each issue developed, his court technique and complete command of the situation at all times, showed that he was equal to the task he had assumed and he proved more than a match for the array of experienced lawyers who appeared for the defendants.

After a long trial during which 5,000 printed pages of testimony were taken and hundreds of exhibits were submitted, most of them accounting records and schedules, counsel submitted briefs and requests for findings of fact and conclusions of law. In the course of my study of the voluminous record I had occasion to request counsel to supplement the record with stipulations of additional facts and exhibits. They also submitted further memoranda and checked calculations made by the Court on the numerous accounting issues. In all of this supplemental work Mr. Pollack for the plaintiffs and Mr. Sher of counsel for General Motors Corporation, were always available and readily responded. This they did fairly and thoroughly, in an effort to aid the Court in its consideration of the many issues of fact and questions of law presented by the large trial record.

After the Court's opinion, findings of fact and conclusions of law were filed on April 10, 1942, in which various defendants were held liable for $4,348,044 and interest, defendant's counsel opened negotiations with plaintiff's attorneys to see if a fair settlement could be arranged under Rule 23(c), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

When I was first consulted in the matter defendant's attorneys had come up to a figure of $3,500,000. Later this was increased to $4,000,000 and a form of release and a list of those contributing to the settlement fund was submitted. In all these negotiations Mr. Pollack took a leading part. On September 2nd the defendants formally submitted their offer of settlement and Mr. Pollack petitioned the Court for an order directing that notice of the offer be sent to all the General Motors stockholders and that a hearing be held on the question of the approval of the settlement.

In addition to the cash benefits resulting to General Motors Corporation from the Court's decision in this case, there are two accounting issues which were so resolved that the Corporation will annually receive benefits therefrom. These rulings were that forfeited bonus stock shall revert to the Corporation and not to the bonus fund, and that treasury stock profits shall not hereafter be included as income in calculating the bonus base. The dollar value of these benefits to the Corporation cannot presently be estimated, but it should represent a considerable saving, even for the General Motors Corporation.

At the hearing on the proposed settlement, on October 5th, certain attorneys, who had not previously had any contact with the case, appeared and objected. After an all day hearing and the submission of briefs I made a review of the whole case and worked out a set of figures which fairly supported the conclusion that the $4,000,-000 offer should not be considered unless it was increased by $500,000 and unless certain claims were eliminated from the proposed settlement, and the release limited in scope. Mr. Pollack then undertook what seemed an impossible task of persuading the defendants to meet the Court's conditions. Apparently he had little success at the start but by persistent efforts and frequent conferences he succeeded in bringing about an agreement, the terms of which are set forth in the Court's memorandum of November 18th and embodied in the Court's order of November 20th.

In his work throughout this case, from the examinations before trial down to the conclusion of the settlement, Mr. Pollack has had the advice and assistance of his partner, Mr. Unger, and members of their office staff. Mr. Winkelman, plaintiff's attorney of record, was also of some assistance. Of course the case could not have been properly prepared and tried without the aid of competent accountants. Mr. Winkelman and the accountants, Bernard E. Singer and David Berdon & Co., are receiving separate allowances. For the services of Mr. Pollack and his partner and their legal staff, and for all their expense in preparing and trying the case which must have been considerable, and for their services in settling this law suit, I believe that the firm of Unger & Pollack is entitled to an allowance of three hundred and ninety thousand ($390,000) dollars. In making this allowance, I have taken into consideration an allowance of $10,000 which I am making to Mr. Nemerov.

■ Joseph Nemerov instituted two stockholders' suits against a number of the directors of General Motors Corporation. He included in a list of 26 defendants in one suit in this Southern District (Singer v. Bishop et al.[1], Civil #6-324), three defendants, Mr. E. Coyle, Charles R. Fisher and Fred J. Fisher (since deceased), who were not named as defendants in the consolidated Winkelman-Jacobson-Kahn suits. The Singer suit was started November 16th, 1939, and was stayed on June 12, 1940, pending the disposition of the Winkelman suit. In a suit in the Supreme Court, Kings County, (Schwartz v. Kaufman et al.) removed to the United States District Court for the Eastern District of New York, 46 F.Supp. 318, he named eight other defendants not included in the Singer suit. The Schwartz suit was commenced April 12, 1939 and was stayed January 15th, 1940. Mr. Coyle, Mr. C. T. Fisher and Mr. F. J. Fisher were not served in the Singer suit, but the executors of Mr. F. J. Fisher's estate, together with Mr. Coyle and Mr. C. T. Fisher, are contributing $298,943.00 towards the settlement of the Winkelman suit and are receiving releases in the form approved in the Court's memorandum of November 18, 1942.

In the Schwartz case (commenced April 12, 1939) the plaintiff was the owner of 50 shares acquired October 22, 1937. The complaint attacked the compensation and bonuses paid to the defendants as excessive and wasteful. In particular plaintiff charged that the transaction by which 1,-375,000 shares of General Motors common stock was sold by General Motors Corporation to the General Motors Management Corporation at $40.00 a share, under the agreement dated March 12, 1930, the subsequent amendment of said agreement and the operation of the bonus plan through Management Corporation until March 15, 1937, were unlawfully and fraudulently conceived and carried out. In the Winkelman case I held that the so-called Management plan of March, 1930, and the amendments thereto were legally adopted by the stockholders and that the payments made to executives under said Management plan were not excessive. Of course under Rule 23(b), F.R.C.P. the plaintiff in the Schwartz suit could not have recovered for any transaction which took place prior to October 22, 1937. In the Winkelman suit this Court inquired into and judicially determined all the transactions and issues presented in the Schwartz complaint.

In the Singer suit plaintiff had owned part of his stock as far back as May 18, 1929. This complaint also attacked the General Motors bonus plan, known as the Management plan, the amendments thereto, and the stock and cash payments made thereunder. The complaint charged that the compensation and bonus awards had been excessive. In paragraph 43 of the Singer complaint it was alleged that the defendant beneficiaries of the bonus plan, by the control they exercised over General Motors Corporation, were able to employ improper accounting devices in calculating the bonus, that would redound to their own advantage. Then followed seven subparagraphs particularizing these alleged improper accounting methods.

On a motion argued before me in December, 1939, for partial summary judgment a brief was filed by Mr. Pollack for plaintiff Kahn, in which he argued that among the issues to be tried in the Winkelman suit were certain improper accounting devices employed by defendants, resulting in the payment of more than the 10% limit under the bonus plans. The brief then stated: "The various accounting devices employed are set forth more fully in the consolidated complaint and particularized more fully in the Singer complaint (Par.

---

[1] No opinion for publication.

43)" from which he then quoted. Among the matter particularized in said paragraph 43 of the Singer complaint was "(E) The inclusion in the income account of 'Motors' of fictitious profits and income". This allegation would include the alleged profit of $10,410,057 for 1930 which, in the Winkleman case, the Court held was improperly added to earnings in computing the bonus base (although the bar of the Statute of Limitations would have been an issue in the Singer suit). Allegation (E) would also include the alleged profit on the treasury stock used in paying the bonus. At page 3880 of the printed record of the trial of the Winkelman action, there is mention of Mr. Pollack's brief on the motion for summary judgment and his reference to the accounting issues listed in the Singer complaint. A number of the accounting issues specifically enumerated in paragraph 43 of the Singer complaint were fully tried in the Winkelman suit and all of them were considered by the Court. On one of them there was a recovery.

In making allowances to attorneys herein Mr. Nemerov is equitably entitled to some recognition. The issues raised by the Schwartz and Singer complaints have been judicially determined in the trial of the Winkelman action. The claims asserted, on which relief might have been granted, are covered by the releases delivered, to those who contribute to the settlement of the Winkelman action. On the special circumstances here presented, I am of the opinion that Mr. Nemerov is entitled to some allowance, even though his Singer action was started two and a half years after the institution of the Winkelman suit. The amount of Mr. Nemerov's allowance must necessarily be limited. He is granted an allowance of ten thousand ($10,000) dollars. This is being deducted from what I would have otherwise allowed Mr. Pollack.

■ Mr. Bernard E. Singer and David Berdon & Co. have filed applications for services as accountants, having been retained by Mr. Pollack to conduct a comprehensive investigation of the matters involved in the above-entitled suit and to assist in the prosecution of such issues as he felt should be placed before the Court for adjudication. These petitioners state in their affidavit:

"The problems relating to the administration of the bonus plans involved many novel considerations in accounting and legal experience. The accounting concepts which flowed from the facts were necessarily tied together with the legal consequences. Accordingly, petitioners' work was enlarged considerably beyond that ordinarily required of accountants, since in addition to being charged with responsibility for the accounting aspects of the case, they had to assist actively, and were requested by Mr. Pollack so to do, at every stage of the litigation and on every issue raised therein: the preparation of the examinations before trial; the examinations themselves; the preparation for trial and the various accounting and trial memoranda; the trial itself and preparation of the scope and program of examinations of the witnesses and the presentation of evidence thereat and the various briefs and the voluminous proposed findings. Constant analysis of the opposing contentions, briefs, findings and arguments were necessarily required of us and undertaken."

\* \* \* \* \*

"Mr. Singer participated in every session at Court and at every examination before trial. Just prior to the trial, at Mr. Pollack's direction, Mr. Singer prepared a memorandum concisely yet comprehensively embodying the accounting facts underlying the alleged miscalculations of bonuses together with a statement of plaintiff's position with respect thereto, covering all of the accounting issues tried before the Court."

I saw Mr. Singer at the counsel-table throughout the trial and he attended some of the conferences on the proposed settlement. But as to the activities of David Berdon & Co. I must rely on the affidavits filed herein, because I do not recall having had any contact with them in the course of this case. Probably much of their work was outside the courtroom. Mr. Singer is both a lawyer and an accountant and I suppose that is why I saw more of him than of the other accountants.

The petitioning accountants refer to other stockholders' suits where the allowances made to accountants were 4½% to 5½% of the amount recovered. I do not feel that any such percentages should apply here. The accountants have submitted no record of the number of hours or days spent in performing their work as accountants. In fact there is no such statement from the principal attorneys. But as to their services the Court is in a better position to judge and fix a value. I do know

that there were many intricate accounting problems involved in this litigation and that the decision of a number of the issues depended on a determination of the proper applicable accounting principles. Having all this in mind I am of the opinion that the allowance to Bernard E. Singer and David Berdon & Co., jointly, in full for their services as accountants in this litigation should be fixed at one hundred thousand ($100,000) dollars.

On October 5, 1942, the date set for the hearing on the proposed offer of compromise and settlement, five attorneys appeared separately for various objectants holding in all approximately 6,000 shares of General Motors common stock. The hearing took most of the day. Formal objections were filed together with petitions for leave to intervene. Briefs were later submitted by attorneys for the parties to the action and by attorneys for the objectants. The Court took the matter under advisement, and after a consideration of the record, the Findings of Fact and Conclusions of Law, the points advanced by the attorneys and the cases cited, the Court prepared a computation of a fair settlement figure ($4,500,000), and further provided that certain claims be specifically excluded from the settlement and that the release be limited, all as set forth in a memorandum filed by the Court on November 4th, 48 F.Supp. 490.

Mr. Pollack, counsel for the plaintiffs, reopened negotiations with the defendants and endeavored to persuade them to agree to the Court's recommendations that the original offer of compromise be modified. This resulted in a conference with the Court concerning a clarification of one of the conditions for approval set forth in the November 4th memorandum, a request that the claims to be settled include any claim based on the reawarding of forfeited bonus stock prior to May 27, 1939 and a limited form of release. The attorneys for the defendants thereafter submitted a letter dated November 17th setting forth in detail the points they had made at the conference and annexed to the letter a new form of release for those contributing to the settlement. All this is related in the Court's memorandum of November 18th. On November 20th an order approving the offer of compromise, as modified, was signed and filed. An appropriate judgment, including a provision for the allowances fixed by the Court, will be entered at the time this memorandum on allowances is filed.

In fixing the allowances to the objectants' attorneys, the Court should consider the nature and extent of their services, and the results obtained. Their services were not extensive, but they contributed to some extent to the increase in the settlement figure. But the real task of convincing the defendants' attorneys that they should pay the increased amount fell upon Mr. Pollack, the principal trial counsel for plaintiff Winkelman. Most of the points objectants urged in opposing the original offer of compromise were common to all their briefs. In working out a set of figures by which the amount to be paid was increased by $500,000 the Court relied on its own knowledge of the case, the amounts involved in the various issues, the questions of law that might be presented in an appellate court, the probabilities of a successful appeal by either side on issues decided against them, and the advantage to General Motors Corporation of accepting an offer of settlement prior to any appeal. It appears to me that under the circumstances an allowance to the five objectants' attorneys of a total of $45,000 is all that the facts warrant.

Mr. Paul J. Kern, representing stockholders owning 1659 shares, filed objections to the proposed settlement. His clients expressed their readiness to bear the expense of any appeal. He conferred with accountants in preparation for the hearing and on October 5th he made oral argument and submitted a memorandum. Later he joined with Mr. Heilbron in a petition for leave to intervene. He opposed, as against public policy, a settlement for anything less than the amount of liability stated in the April 10, 1942, decision and he questioned the power of the Court to approve such a settlement. The scope of the release, the inclusion therein of any claims arising from the Brown-Raskob transaction or arising from the expenditure of funds of the corporation in the defense of the defendant directors—the form, contents, fairness and sufficiency of the notice of the proposed settlement—were also criticised. These points were discussed in the Court's memorandum of November 4th.

Mr. Kern's application for an allowance does not state the time he spent in preparing his papers and brief or in other services herein. However, from a consideration of the record, the papers submitted and the facts set forth in his application, I am of the opinion that an allowance of twelve thousand five hundred ($12,500) dollars

would adequately cover the services rendered and his expenses, with due consideration for the results achieved. Further, four sets of attorneys, representing other objectants, are also seeking allowances for their services in opposing the original offer of settlement. A number of them urged the same objections. I am giving separate consideration to the services rendered by each of them, at the same time having in mind that their joint services and the results achieved were of a certain total value to General Motors Corporation.

█ The firm of Hays, St. John, Abramson & Schulman represent the owner of 1,485 shares of General Motors common stock. They were retained September 15th and later filed objections to the settlement, a petition for leave to intervene and a brief. Mr. Heilbron of that firm made an oral argument at the hearing on October 5th. He objected to the settlement as inadequate in amount, to the form and contents of the notice sent to the stockholders and to the release of any claim growing out of the Raskob-Brown transaction. The form of release was later modified and the cash amount offered in settlement has been increased by $500,000. In addition to his oral argument, Mr. Heilbron filed an affidavit supporting his objections and submitted a brief. It appears that a member of the Ohio bar, through whom Mr. Heilbron's firm was retained, was associated with him in the case and joined in the brief. It is stated that their client was ready to bear the expense of an appeal, if the Court had approved the original offer.

Mr. Heilbron in his application for an allowance shows that he made a study of the Court's opinion, findings of fact and conclusions of law (dated April 10, 1942) and of the Court's memorandum of September 4, 1942, 48 F.Supp. 485, together with the notice to stockholders and its accompanying papers. He also inquired into various legal questions, such as the Court's power to fix the rate of interest on the amounts for which defendants had been held liable. He conferred with certified public accountants concerning the tax payable by General Motors Corporation on any amount received in settlement, and the tax deduction benefits of those contributing to the settlement. By appointment he discussed the case with members of the Corporation's legal staff, seeking further information and inspecting some exhibits and portions of the record of the trial.

After the argument on October 5th and the submission of a brief, Mr. Heilbron studied the question of intervention and a possible appeal to review the Court's decision, if the original settlement had been approved. He and Mr. Kern joined in a petition for leave to intervene. The present application seeks reimbursement for $300 in expenses (not itemized). The number of hours devoted to the case is not stated but a lengthy affidavit outlines all the services rendered. I am of the opinion that the allowance to the firm of Hays, St. John, Abramson & Schulman, for their services and for those of their associate and for expenses, should be in the sum of twelve thousand five hundred ($12,500) dollars.

█ The firm of McCauley, Spiegelberg, Davis and Gallagher, through Mr. Abraham N. Davis, appeared for certain objectants, residing in Massachusetts, owning 1,249 shares of General Motors common stock. Mr. Davis presented oral argument and submitted a short memorandum on October 5th. He later filed an affidavit specifying the grounds of his objection. He objected to the amount of the settlement as inadequate, and especially to the release of any claim against Mr. Raskob and others for benefits they derived from the so-called Brown-Raskob transaction of June 4, 1930. This claim was later specifically excluded from the settlement. Mr. Davis also objected in other respects to the scope of the release, as did other attorneys. In preparation for the argument of his objections he studied the Court's opinion, findings of fact and conclusions of law filed April 10, 1942, examined pertinent court decisions and conferred with an associate attorney. The number of hours given to this work is not stated in his application for an allowance. There is no question but that Mr. Davis and his clients were sincere in their opposition to the compromise as originally proposed. Their clients' interests were substantial and their opposition was helpful. I believe that the firm of McCauley, Spiegelberg, Davis and Gallagher is entitled to an allowance of ten thousand ($10,000) dollars.

█ Mr. J. W. Giesecke of St. Louis and J. S. McCook of New York appeared for certain stockholders whose total holdings were 90 shares. One of

the main points urged by Mr. Giesecke in opposition to the proposed compromise was that the Court did not have jurisdiction to entertain it, once the Court's decision was filed, even though judgment had not been entered. I ruled against this contention. His objections to the scope of the release and the fairness of the notice of settlement were similar to those advanced by other attorneys. He also opposed any settlement for less than the full amount, as against public policy. Of course, Rule 23 (c) contemplated the compromise of stockholders suits, under proper supervision of the Court. The rules have the effect of a statute. A question of public policy had developed in actions of this type, due to the private and secret settlement of stockholders suits, made without Court review and without notice to other stockholders. Against that unsavory practice the corrective provisions of Rule 23(c) were directed. Mr. Giesecke made one appearance in Court, filed a petition for leave to intervene and filed objections to the settlement. He also submitted a brief. Of course, he did further work in the preparation of his papers and some legal research in developing the points of his brief. In all he spent 55½ hours in a study of the issues and the pertinent authorities, and in other incidental office work.

For the services rendered by Mr. Giesecke and his New York associate Mr. McCook, and for their expenses the sum of six thousand ($6,000) dollars is adequate.

 Raymond L. Wise represented an objectant who is the owner of 10 shares of General Motors stock. While the smallness of a plaintiff's stockholdings in a corporation is no bar to the institution of a derivative action, yet where objection is made to the compromise of a derivative action instituted by other stockholders, the Court may properly wonder why the holder of 10 shares, out of 43,000,000 shares outstanding, should go to the trouble of getting a lawyer to object. The amount of the settlement meant only 10¢ a share for his 10 shares of stock. At the hearing there were holders of much larger interests, who had competent attorneys to advance the points made against the proposed compromise, and who were able and willing to bear the expense of an appeal.

However, Mr. Wise prepared written objections on behalf of his client, attended the October 5th hearing, made oral argument and later filed a brief. On the oral argument he contended that the offer of settlement was inadequate, that the proposed release was too broad and that in the notice to the stockholders the settling defendants should have admitted liability. The latter was hardly to be expected, since the offer was without prejudice; nor was it necessary, in view of the size of the offer.

Mr. Wise's application does not state the time spent in preparing his objections, petition and brief. He was not retained until September 30th. He states that two other lawyers were associated with him in this matter. An allowance of four thousand ($4,000) dollars to Mr. Wise and his associates is reasonable, under the circumstances.

The judgment herein will therefore provide for the payment of the following allowances:

| | |
|---|---:|
| Arthur S. Friend | $ 15,000.00 |
| Charles Winkelman | 75,000.00 |
| Arthur Berenson and Lawrence Berenson | 160,000.00 |
| Unger & Pollack | 390,000.00 |
| Joseph Nemerov | 10,000.00 |
| Bernard E. Singer and David Berdon & Co. | 100,000.00 |
| Paul J. Kern | 12,500.00 |
| Hays, St. John, Abramson & Schulman | 12,500.00 |
| McCauley, Spiegelberg, Davis & Gallagher | 10,000.00 |
| J. W. Giesecke and J. S. McCook | 6,000.00 |
| Raymond L. Wise | 4,000.00 |

This memorandum shall serve as the Court's findings of fact on which the above allowances are based.